**ANDREW S., By and Through his next friends MARGARET S. and James S., Plaintiffs,**

v.

**THE SCHOOL COMMITTEE OF THE TOWN OF GREENFIELD, MASSACHUSETTS, Defendant.**

**Civil Action No.95–30025–MAP.**

United States District Court, D. Massachusetts.

Aug. 5, 1999.

Stewart T. Graham, Jr., Hampden, MA, for Andrew S., by and through his next friends Margaret S. and James S., Plaintiffs.

Peter L. Smith, Paroshinsky Law Offices, Springfield, MA, for School Committee of Town of Greenfield, Mass., Defendant.

## MEMORANDUM REGARDING DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

### (Docket Nos. 86 & 97)

PONSOR, District Judge.

### I. INTRODUCTION

This case raises an issue of first impression within the First Circuit, and one that has bedeviled other Courts of Appeals: whether an individual seeking a remedy for straightforward violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, may simultaneously seek compensatory and punitive damages for those same violations under the civil rights statute, 42 U.S.C. § 1983. For the reasons set forth below, this court will hold that, on the facts of this case, no section 1983 cause of action is available. The defendant's motion to dismiss this count of the complaint will therefore be allowed.

Plaintiffs also seek reimbursement of the attorneys' fees expended by them to obtain relief for the violations of the IDEA. *See* 20 U.S.C. § 1415(i)(3)(B) (Supp.1999). As will be seen, plaintiffs did prevail, though only in part, in their claim against the Greenfield School Committee under the IDEA. The motion for fees will therefore be allowed, in part. Defendant's

motion to dismiss this count of the complaint will be denied, but the court will, *sua sponte,* dismiss this count as moot in view of the ruling on the motion for fees.

## II. FACTS

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept the facts as asserted in the complaint as true. *See Garita Hotel Ltd. Partnership v. Ponce Fed. Bank,* 958 F.2d 15, 17 (1st Cir.1992). The motion must be denied unless the court finds "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The facts set forth below are considered in accordance with this standard.

Andrew, a child diagnosed from birth with autism, received services from an independent program in Amherst, Massachusetts called the Early Childhood Learning Center (ECLC) up to the age of three. At that time the defendant Greenfield School Committee, the so-called Local Educational Agency ("LEA"), assumed responsibility for providing Andrew a free, appropriate public education. Amended Complaint (Docket No. 27 at ¶ 16). A disagreement arose during the 1993–94 school year between Andrew's parents and the defendant over whether Andrew should continue at ECLC or receive his schooling through a specialized program offered within the public school. The controversy was over whether an "integrated" or "non-integrated" program was appropriate for Andrew.

At first, Andrew was placed in the Greenfield integrated program. Plaintiffs charge that the program failed to address Andrew's needs, most significantly as a result of inadequate staff training. Negotiations and discussions took place between the parents and school officials throughout the academic year 1993–94 and into the summer. An independent evaluation of the program resulted in recommendations for increased staff training that, plaintiffs allege, never occurred. (*Id.* at ¶¶ 33 and 40).

In the fall of 1994 Andrew was again placed into the allegedly inadequate Greenfield program, and the parents requested a hearing before the Massachusetts Board of Special Education Appeals (BSEA), seeking placement of Andrew into either ECLC or another off-site program, the River Street School in Windsor Locks, Connecticut. (*Id.* at ¶ 53).

In January of 1995, after hearing a number of witnesses, the BSEA hearing officer found against the parents in a preliminary order, declining to order Andrew's placement in an off-site program but requiring some improvements in Greenfield's program. (*Id.* at ¶¶ 60–61).

On February 2, 1995 plaintiffs filed their original complaint with this court seeking a declaration that the BSEA decision was arbitrary and capricious, and an order requiring the defendant to place Andrew in the ECLC program. Complaint (Docket No. 1 at 9). On February 6, 1995 the court heard plaintiffs' motion for a temporary restraining order, seeking immediate placement of Andrew in a new off-site program, the New England Center for Autism.[1] The motion was denied on February 21, 1995.

Proceedings before this court and the BSEA thereafter continued in tandem. On August 4, 1995 the BSEA hearing officer issued her final opinion concluding as follows:

1. The 1993–1994 502.8(b) Individualized Education Plan proposed by Greenfield was reasonably calculated to ensure the maximum feasible educational benefit to Andrew, in the least restrictive setting;

---

1. By the time of the hearing on the TRO, ECLC was ceasing operations and no longer available as an alternative placement.

2. The 1994–1995 502.8(b) Individualized Education Plan as written by Greenfield was reasonably calculated to provide the maximum feasible benefit to Andrew in the least restrictive setting. Implementation of that IEP was hampered however, by inadequate staff training and insufficient home-school coordination. To remedy this Greenfield must, within ten days of the date of this decision, arrange for a comprehensive training of pre-school teachers, aides, supervisors, and providers of related therapies in the techniques of behavioral teaching. This training must be substantially equivalent in nature, scope, and length to the training provided to the teachers at the Early Childhood Learning Center and the New England Center for Autism. In addition Greenfield must provide independent supervision, monitoring, and consultation to all preschool service providers by a teacher certified in special education with training and experience in both autism and behavioral teaching principles. This supervision/consultation shall take place, at a minimum, one full school day per week.

In addition, a systematic, written, home-school coordination plan must be developed. . . .

3. The River St. School is inappropriate and unduly restrictive for Andrew S.;

4. The parent is entitled to an independent psychological evaluation funded by the Greenfield Public Schools.

(Docket No. 88, Exhibit 6).

On September 13, 1995 plaintiffs filed their amended complaint, contending that the August 4, 1995 decision of the hearing officer was "contrary to law, arbitrary and capricious, not based on the facts adduced at the hearing nor on the applicable law and violates [Andrew's] right to a free, appropriate education." Amended Complaint (Docket No. 27 at ¶ 87). This amended complaint for the first time asserted a violation of 42 U.S.C. § 1983 and sought, in addition to the remedies under the IDEA, compensatory and punitive damages, and a jury trial.

The court thereafter made extensive efforts to assist the parties in mediating their dispute. Eventually, a neutral expert was retained to assist the court and counsel in reaching a resolution in the best interests of Andrew. This expert, whose credentials were approved by both sides, concluded, like the BSEA officer, that placement outside the Greenfield school system was not appropriate and recommended certain changes in the existing program. The changes were effected, and Andrew did in fact attend the Greenfield program for the latter part of the 1995–96 school year. He has since transferred to another school district.

On the face of it, the eventual effectuation through the IDEA process of acceptable changes in the integrated program, and Andrew's participation in it, would appear to resolve the issues raised by the complaint, but two counts do remain.[2] First, in Count Four, plaintiffs claim that the LEA intentionally denied Andrew a Free Appropriate Public Education ("FAPE") as required by the IDEA and that as a result plaintiffs suffered emotional distress for which they are entitled to compensatory and punitive damages under 42 U.S.C. § 1983. (*Id.*, at ¶¶ 101–102).

For purposes of the discussion to follow, it is important to underline here that plaintiffs' grievance against the Greenfield

---

**2.** During the motion hearing, plaintiffs' counsel represented to the court that they were not pursuing Counts One, Two and Three of the five-count complaint. Counts One and Two assert claims against the Department of Education ("DOE"). The DOE has been dismissed without objection by plaintiffs.

Count Three alleges violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, and 42 U.S.C. § 1983 arising from alleged *ex parte* communications between defense counsel and the BSEA hearing officer. Plaintiffs have also dropped this claim.

School Committee, or LEA, arises solely from their dissatisfaction with the nature of the educational services offered Andrew, particularly inadequate staff training. Defendant of course disputes this allegation, denying any inadequacy and contending that teacher training was enriched, partly as a result of ongoing staff support, and partly to address the parents' concerns, but not as a result of the litigation. Whatever the parties' dispute, however, it is noteworthy that no broad due process or equal protection claim is asserted, and no allegation is made of any widespread or longstanding pattern and practice in this regard in Greenfield. Moreover, no claim is made that the LEA utterly turned its back on Andrew, flatly refusing to recognize his disability, or trivializing it, or declining to offer any substantial special services. The section 1983 claim contained in Count Four is that the specific services offered to Andrew by the LEA were not, in plaintiffs' view, adequate and thus did not provide him a FAPE.

The second remaining claim, in Count Five, is that plaintiffs were—substantially, if not entirely—the "prevailing party" during the 1995 BSEA proceedings and are, therefore, entitled to attorneys' fees and costs under the IDEA directly. *See* 20 U.S.C. § 1415(i)(3)(B) (Supp.1999). Defendant has moved to dismiss both Counts Four and Count Five. Plaintiffs have filed a separate motion for fees.

## III. DISCUSSION

### A. SECTION 1983 AND THE IDEA

■ It is well established that 42 U.S.C. § 1983 does not confer substantive rights, but rather provides a vehicle to redress deprivation of rights already secured.[3] The underlying rights asserted in an action under section 1983 may be based upon the Constitution or a federal statute. *See State of Maine v. Thiboutot*, 448 U.S. 1, 5–6, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). Where a federal statute is relied upon, however, it is normally insufficient for a plaintiff merely to assert a simple violation of federal law. In order to anchor a claim under section 1983, a statutory violation must rise to the level of a violation of a federal *right* secured by the statute. *See Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Moreover, a plaintiff must show that, in enacting the statute at issue, Congress did not create an independent enforcement mechanism sufficiently comprehensive to demonstrate Congressional intent to preclude a section 1983 remedy. *See id.* at 346–47, 117 S.Ct. 1353. In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court stated that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief" for a cognizable statutory violation. *Id.* at 70–71, 112 S.Ct. 1028.

■ The question whether a statutory violation, arising from a failure to provide a disabled child an appropriate education, might expose a school committee to suit under section 1983 has an unusually rich judicial and legislative provenance.

The statutory predecessor to the IDEA, the Education of the Handicapped Act ("EHA"), presented this exact question, which was definitively resolved by the Supreme Court in *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). The plaintiffs in *Smith* had asserted claims for Constitutional violations under 42 U.S.C. § 1983 for what were, essentially, statutory violations of the EHA. *See id.* at 994, 104 S.Ct. 3457. Among other

---

**3.** 42 U.S.C. § 1983 provides in part:
Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

things, they sought attorneys' fees, which were available via 42 U.S.C. § 1988, but not (at that time) via the EHA.

The Court concluded that, for claims based *either* on the EHA or on the Fourteenth Amendment's Equal Protection clause, "the EHA is the exclusive avenue through which the child and his parents or guardian can pursue their claim." *Id.* at 1013, 104 S.Ct. 3457. Among other things, this holding made it clear that violations of the EHA for failure to provide educational services could not form the basis of a separate claim under section 1983.

In 1986, apparently in response to the Supreme Court's decision in *Smith,* Congress amended the EHA. This amendment did at least three things. First, it changed the name of the statute to the Individuals with Disabilities Education Act ("IDEA").[4] *See* 20 U.S.C. § 1400(a). Second, it added a provision for attorneys' fees, which the EHA had lacked. *See* 20 U.S.C. § 1415(i)(3)(B). This new provision generated some debate, because of concern that the fee provision would overburden financially strapped school districts and encourage litigation. *See* 132 Cong. Rec. H4841-01 (daily ed. July 24, 1986) (statements of Representative Bartlett). Third, the amendment added the following language to the statute:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of handicapped children and youth . . . .

20 U.S.C. § 1415(f).[5]

In considering the enactment of the IDEA, Congress debated both the purpose of the statute and the Supreme Court's

*Smith* decision. For instance, in 1985, during the first session of the 99th Congress, when the bill introducing the amendment to the EHA was proposed, the House Report stated:

> . . . since 1978, it has been Congress' intent to permit parents or guardians to pursue the rights of handicapped children through EHA, section 504 [the Rehabilitation Act] and section 1983 . . . . Congressional intent was ignored by the U.S. Supreme Court when, on July 5, 1984, it handed down its decision in *Smith v. Robinson.*

H.R.Rep. No. 99–296, at 4 (1985). Later, after further debate in both chambers of Congress, the House Conference report stated that "[i]t is the conferees' intent that actions brought under 42 U.S.C.1983 are governed by this provision." H.R. Conf. Rep. No. 99–687, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1807, 1809.

Despite these protestations, the statute amending the EHA and creating the IDEA, as ultimately enacted, lacked any explicit reference to 42 U.S.C. § 1983. In the ensuing years, this silence has perplexed the courts and generated, to some degree, a split of opinion among the Courts of Appeals regarding the relationship between section 1983 and the IDEA. The Second, Third and Fifth Circuits have held that section 1983 may be invoked, at least in some instances, to obtain redress for statutory violations of the IDEA. *See Mrs. W. v. Tirozzi,* 832 F.2d 748, 753 (2d Cir.1987); *W.B. v. Matula,* 67 F.3d 484, 494–95 (3d Cir.1995); *Angela L. v. Pasadena Indep. Sch. Dist.,* 918 F.2d 1188, 1193 n. 3 (5th Cir.1990). *See also Cappillino v. Hyde Park Cent. Sch. Dist.,* 40 F.Supp.2d 513, 515–516 (S.D.N.Y.1999); *Padilla v.*

---

**4.** Some decisions following the amendment continue to refer to the statute as the EHA. This decision will refer to the IDEA after the 1986 amendments.

**5.** Pursuant to statutory revisions, section 1415(f) has been renumbered as 1415(1) and its language has been slightly modified. As

the conduct in this case occurred before these amendments, this court will refer to 1415(f). In any event, the amendments would make no difference to the outcome of this case. *See Sellers v. School Bd.,* 141 F.3d 524, 526 n. 2 (4th Cir.1998).

*Sch. Dist. No. 1*, 35 F.Supp.2d 1260, 1266–69 (D.Colo.1999).[6]

By contrast, the Seventh, Eighth and, most recently, Fourth, Circuits have reached a contrary conclusion: plaintiffs may not ordinarily bring suit under section 1983 for straightforward statutory violations of the IDEA. *See Charlie F. v. Board of Educ.*, 98 F.3d 989 (7th Cir.1996); *Heidemann v. Rother*, 84 F.3d 1021, 1033 (8th Cir.1996); *Sellers v. School Bd.*, 141 F.3d 524, 529 (4th Cir.1998).[7] The First Circuit has not addressed this issue.

The facts in *Sellers* are, superficially, somewhat different from those presented here, but the logic of the decision is directly applicable to this case. Moreover, as will be seen, the split among the circuits may not be as stark as first appears.

Kristopher Sellers was learning disabled and emotionally disturbed. Nevertheless, he received no special education services until the end of his attendance in the Manassas, Virginia public schools. In a complaint filed when Kristopher was eighteen, his parents made two claims: first, that the school district had failed to evaluate their son properly and designate him for special services; and, second, that except for his final year in school, when his special needs were first recognized, it failed to provide him with a free appropriate public education. *See Sellers*, 141 F.3d at 525–26. The latter claim, which became the centerpiece of the Sellers' lawsuit, is obviously identical to the one made on behalf of Andrew here.

The plaintiffs in *Sellers* reached a complete settlement with the Manassas School Board as to all educational issues. Nevertheless, they argued that they were also entitled to compensatory and punitive damages under three statutes—the IDEA, section 504 of the Rehabilitation Act and 42 U.S.C. § 1983—to compensate Kristopher for the years he was not receiving a FAPE. They filed suit in federal court seeking this monetary relief. The district court judge, terming the Sellers' action one for "educational malpractice," dismissed the lawsuit for failure to state a claim. *See id.* at 526.

On appeal, the Fourth Circuit affirmed. Chief Judge Wilkinson's decision disposed first of the IDEA and Rehabilitation Act claims. He found that compensatory or punitive damages "would transform the IDEA into a remedy for pain and suffering, emotional distress, and other consequential damages caused by the lack of a free appropriate public education. Such a result would be inconsistent with the structure of the statute . . . ." *Id.* at 527. The IDEA's "carefully crafted statutory scheme," the court noted, overcame the presumption in favor of any appropriate relief articulated by the Supreme Court in *Franklin. Id.* at 527 n. 3. Moreover, the court stated, the consideration of awards of compensatory and punitive damages under the IDEA would present "acute problems of measurability" and would offer a "range of possible monetary awards [that] would be vast, particularly in cases seeking recovery for less tangible injuries such as emotional distress or pain and suffering." *Id.* at 528. On these grounds the Fourth Circuit found no justification for an award of compensatory or punitive damages directly under the IDEA.

As to the claim for violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), the Fourth Circuit found that no facts were presented suggesting actionable discrimination based on disability, *i.e.*, con-

---

**6.** A Massachusetts Superior Court decision, *McLaughlin v. City of Lowell*, No. CIV.A. 94–5069, 1998 WL 224929 (Mass.Super. Ct. April 3, 1998), appears to fall in this line. The facts of that case, however, which involve a non-disabled female student traumatized by a rape and prohibited from attending graduation ceremonies, bear much more resemblance to a traditional section 1983 action, than an IDEA case.

**7.** *Crocker v. Tennessee Secondary School Athletic Association*, 980 F.2d 382 (6th Cir.1992), is sometimes cited as another case in this line, but its holding is not as clear.

duct reflecting "bad faith or gross misjudgment." *Id.* at 529. This deficiency required dismissal of the section 504 claim.

Turning to section 1983, *Sellers* focused on the 1986 amendments to the EHA that created the IDEA and particularly on section 1415(f). The obvious question was whether these amendments entirely restored to plaintiffs what the Supreme Court's *Smith* decision took away.

Chief Judge Wilkinson concluded that, while the amendments did effect a legislative reversal of much of the *Smith* holding, they did not afford children, or their parents suing for them, the right to demand compensatory and punitive damages in a jury trial under 42 U.S.C. § 1983 for a simple statutory violation of the IDEA. When it was found that a local school committee had violated the IDEA by failing, in some respect, to provide a particular disabled student appropriate educational services, Congress did not intend, the Fourth Circuit held, to provide an additional remedy under the civil rights statute. *See id.* at 529–32.

The court's logic in reaching this conclusion is compelling and requires dismissal of plaintiffs' section 1983 claim here. Garden variety statutory violations of the IDEA cannot form the basis for a section 1983 action for at least four reasons.

First, the 1986 amendments to the EHA, which created the IDEA, lack any explicit reference to section 1983. Section 1415(f) specifically mentions Title V of the Rehabilitation Act of 1973 and refers, in addition, only to "other Federal statutes protecting the rights of children and youth with disabilities." Section 1983 is not specially aimed at protecting the rights of disabled children. Although it has general application, of course, to violations of civil rights, this oblique reference hardly suggests that Congress was adamant that every violation of the IDEA, if proved, would entitle the plaintiff to full remedies under section 1983. It would have been simple to make this point clearly, had Congress intended it.

Second, to the extent that section 1415(f) can be read as implying a possible remedy under section 1983 in some instances, the statute's clear implication is that this tool for vindication of civil rights should be reserved for cases where the alleged misconduct is *constitutional* in proportion, not merely statutory. In other words, section 1415(f) was intended to make clear that a disabled child suffering a violation of his constitutional rights would not be left with the IDEA as his *only* available tool for redress no matter how egregious or protracted the LEA's misconduct. Given the history of widespread, entrenched disregard for the rights of disabled children within public schools, it is not difficult to imagine lawsuits raising profound issues of equal protection, as large as any that might be conceived under the Fourteenth Amendment. By making section 1983 available in that situation, however, Congress cannot be viewed as also mandating a section 1983 action every time a disagreement arose between a parent and school official about a particular educational placement, the number of classroom aides, or the credentials of a consultant. Plaintiffs' argument here, if accepted, would turn every routine special education dispute into a civil rights action.

Pursuing this point, the *Sellers* court noted that "[t]he different standards of liability applicable to constitutional equal protection claims and to statutory IDEA claims confirms" the narrower interpretation of section 1415(f). *Sellers*, 141 F.3d at 530. A "simple failure" to provide a child with a FAPE entitles a plaintiff to redress under the IDEA. Section 1983 normally requires much more. Under the Fourteenth Amendment, purposeful discrimination must be shown. Moreover, since disabled persons have not been classified as a suspect class, the defendant's conduct would have to be shown to be without rational basis. It is not surprising, then, that Congress reserved section 1983 for truly constitutional violations, when they

could be shown, and allowed the remedial mechanism of the IDEA to address the inevitable differences of opinion and negotiations between parents and school officials regarding the provision of services in specific instances.

Third, properly viewed, the legislative history of section 1415(f) supports a narrower interpretation of the applicability of section 1983 in this context. None of the comments by various members of Congress suggests that every successful IDEA plaintiff would automatically have a claim under section 1983, including the right to compensatory and punitive damages and a jury trial. As Chief Judge Wilkinson stated:

> When construed in their most natural form, the excerpts [from the Congressional Record] demonstrate the unremarkable proposition that Congress intended section 1415(f) to restore the ability of disabled children and their parents or guardians to utilize section 1983 to protect constitutional rights.

*Id.* at 531.

Finally, a broader interpretation of the effect of section 1415(f) would violate the Supreme Court's mandate in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Statutes like the IDEA are enacted pursuant to Congress' spending power. The federal-state relationship in this situation works like a contract: in return for receiving certain funds, the states agree to undertake certain responsibilities, with specified liability if they fail to comply. "States cannot knowingly accept federal funding conditions unless they are accurately apprised of the requirements being imposed by the federal government." *Sellers*, 141 F.3d at 531–32. Plaintiffs' interpretation of section 1415(f) would expose hard-pressed school boards and school committees to potential liability "exponentially greater" than they now face under the IDEA. Every administrative decision that might, at a later trial, be deemed inappropriate by a jury would expose a school committee to an award of damages for pain and suffering and possible punitive damages under section 1983.

The concern expressed by the Fourth Circuit was echoed in a recent opinion of the Supreme Court, *Cedar Rapids Community School District v. Garret F.*, 526 U.S. 66, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999). While the Court rejected a "cost-based standard as the sole test for determining the scope" of the IDEA, Justice Stevens, writing for the majority, did recognize that "the potential financial burdens imposed on participating States may be relevant to arriving at a sensible construction of the IDEA." *Id.* at 999. (citation omitted).

Even in cases not tried to verdict, the pressure to concede every claim, even the most marginal, and reach settlement at any cost, rather than face exposure under section 1983, would jeopardize the structure of the IDEA itself and distort the administrative proceedings at its heart. The concern of Congress about the attorneys' fee provision strongly suggests that Congress never intended this result. In any event, without a much clearer mandate from Congress, no such profound alteration in the relationship between school officials and disabled students and their families can be inferred in a statute enacted pursuant to Congress' spending power.

Even the cases relied on by plaintiff from other circuits are not as dramatically inconsistent with the *Sellers* holding as might appear at first blush.

*Mrs. W. v. Tirozzi*, 832 F.2d 748 (2d Cir.1987), a class action, manifestly raised issues of constitutional proportions, much broader in scope than plaintiffs' claims here.

> The complaint was not limited to objections regarding the individualized educational programs of Diedre W. and Nathan B., but rather was directed at an alleged pattern and practice of the Bridgeport School Board regarding all

handicapped children in its school system.

*Id.* at 752. Given the nature of the allegations, it is obvious that the *Sellers* court would have agreed with the Second Circuit's reversal of the district court's dismissal in *Tirozzi.* To repeat, the 1986 amendments to the EHA make clear that disabled children alleging a bonafide violation of their Fourteenth Amendment rights should not be deprived of a remedy under section 1983, merely because their rights may, to some extent, enjoy simultaneous protection under the IDEA.

*Angela L. v. Pasadena Independent School District,* 918 F.2d 1188 (5th Cir. 1990), addressed the issue of entitlement to attorneys' fees under the 1986 amendment to the EHA. There is no extensive discussion of the relationship between the IDEA and section 1983; the court merely noted the availability of a section 1983 remedy in a footnote. *See id.* at 1193 n. 3.

*W.B. v. Matula,* 67 F.3d 484 (3rd Cir. 1995), is plaintiffs' best case. Even in this litigation, however, the defendants' misconduct was much more egregious than what is alleged regarding Andrew. That case required ten days of preliminary hearings, followed by twenty-seven days of proceedings before an ALJ, who blasted the defendants in a fifty-four-page opinion for their "unwillingness to recognize and appreciate E.J.'s neurological impairments despite ample reliable evidence thereof." *Id.* at 490.

The district court had dismissed *Matula* based on a supposed settlement of the bulk of plaintiff's claims and a failure to exhaust administrative remedies regarding the balance. In reversing, the Third Circuit held that monetary damages were potentially available under both the IDEA and section 1983, but cautioned that a district court might find equitable relief (such as educational services and reimbursement for private educational expenses) the appropriate remedy "rather than compensatory damages for generalized pain and suffering." *Id.* at 495.[8] Thus, while the holdings of *Matula* and *Sellers* clearly disagree, the Third Circuit's hesitancy about awarding compensatory damages moves it closer to *Sellers* than might at first appear.

This case is much weaker than *Matula,* on its facts, in any event. Plaintiffs cannot allege that the defendant flatly failed to recognize Andrew's need for special services. To repeat, the complaint on its face makes clear that the underlying dispute, fierce and complex as it clearly was, boiled down to the details of how those needs were to be met. As *Sellers* indicates, neither the language of the 1986 legislation nor its legislative history, suggest such an unprecedented application of section 1983 in this situation. The IDEA, with its provisions for equitable relief and attorneys' fees, provides plaintiffs a complete remedy.

Furthermore, even if a section 1983 remedy were hypothetically available in this case, plaintiffs' claim is subject to dismissal on an independent basis: plaintiffs have failed to plead that the violation of Andrew's rights occurred as a product of a custom and policy of the Greenfield School Committee. This is required when a section 1983 action is asserted, not against the direct perpetrators of a violation, but against a supervisory entity such as the defendant here. *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Foley v. City of Lowell,* 948 F.2d 10, 14 (1st Cir.1991). Under *Monell,* when supervisory or municipal officials are sued, a plaintiff must allege that a custom or policy of the municipal entity caused plaintiff's alleged injury. There is no liability on a theory of a *respondeat superior.* Significantly, in *Matula,* plaintiff sued the child's

---

**8.** The awkward task of fashioning appropriate relief in the context of a jury trial under section 1983 is not discussed in *Matula.* Some formal decision would be necessary if the issue of compensatory damages was to be withdrawn from jury consideration, and some standard for making this decision would still be needed.

teachers, principal, school nurse and school psychologist, the actual, alleged perpetrators of the alleged constitutional violation.[9]

In this case, the only remaining defendant is the School Committee of the Town of Greenfield, Massachusetts. At no time did plaintiffs name the persons actually responsible for the decisions about Andrew's schooling as defendants. As such, plaintiffs' failure to plead custom or policy provides an independent basis for dismissal.

## B. *FEES UNDER THE IDEA*

■ The defendant has also sought dismissal of plaintiffs' claim for fees under the IDEA in Count Five. Plaintiffs have pressed the issue through their motion for fees. (Docket No. 97). As noted previously, the 1986 amendments to the IDEA provide attorneys' fees to a "prevailing party":

> In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.

20 U.S.C. § 1415(i)(3)(B) (Supp.1999). To qualify as a prevailing party, the plaintiff must show both materiality and causation. *See New Hampshire v. Adams*, 159 F.3d 680, 684 (1st Cir.1998) (citing *Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)); *see also Kathleen H. v. Massachusetts Dep't of Educ.*, 154 F.3d 8, 14 (1st Cir.1998).

To prove materiality, a plaintiff must show success on some significant claim within the litigation. *See Adams*, 159 F.3d at 684. The causation element simply requires that "the party either must have enjoyed some bottom-line litigatory success or her suit must have had a catalytic effect in bringing about a desired result." *Id.* (quoting *Farrar*, 506 U.S. at 111–12, 113 S.Ct. 566).

■ In sum, to be a prevailing party, plaintiff must receive a tangible benefit, and must receive it as a result of the "litigatory process," and not simply as "relief that in all probability was attainable without the time and expense" of litigation. *Id.* at 687, 113 S.Ct. 566.

■ In this case, the plaintiffs have met both requirements of prevailing party status and are, therefore, entitled to reasonable attorneys' fees. The parents, in bringing their appeal, sought placement for their child in an off-site program. Underlying this impulse, however, was the parents' concern that the Greenfield school system did not provide teachers adequately trained to address Andrew's special needs. Because of the teachers' inadequate training, the parents contended that Andrew was not receiving an appropriate education within the less restrictive setting of the integrated school system.

In the August 5, 1995 BSEA decision, the hearing officer concluded that the 1993–94 and 1994–95 Individualized Educational Plans ("IEP's") *were* "reasonably calculated to ensure the maximum feasible education benefit for Andrew." Like the consultant ultimately retained by the court, the officer rejected the parents' contention that an outside placement was appropriate. However, based on the evidence presented during the hearing, the hearing officer did also conclude that implementation of Andrew's educational plan was hindered by inadequate staff training and inadequate home-school coordination. The BSEA decision then mandated that the Greenfield school system arrange for adequate training for teachers, aides, supervisors and providers of related therapies.

The BSEA mandate did not grant the parents the specific relief they requested, but they did obtain a partial remedy: ap-

---

9. In *McLaughlin*, cited above at n. 6, the Massachusetts Superior Court Judge also dismissed the municipal entity, leaving only the individual defendants. *See* 1998 WL 224929 at *14.

propriate educational services by staff trained to address Andrew's particular needs. This mandate did materially alter the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefitted the plaintiffs. *See Adams,* 159 F.3d at 684 (quoting *Farrar,* 506 U.S. at 111–12, 113 S.Ct. 566).

Moreover, the hearing officer's mandate to the Greenfield school system satisfied the causation element. The First Circuit in analyzing this element has used two tests: the merits test and the catalyst test. *See Adams,* 159 F.3d at 684–85. Under the merits test, a party achieves prevailing party status if he or she wins the litigation. *See id.* at 684–85. Under the catalyst test, the party must prove that his or her action served as the force that compelled the defendant to meet the party's claims, even though the process did not formally reach a favorable termination. *See id.* at 685.

Here, the parents' initiation of the litigatory process was the provocation or "catalyst" that prompted the Greenfield school system to train its staff appropriately. Entreaties short of litigation were plainly insufficient to generate adequate responsive action. For this reason, the plaintiffs are entitled to an award of a portion of their attorneys' fees.

Counsel's submission in support of an award of fees under the IDEA is detailed and comprehensive. The hourly rate of $175.00 claimed is reasonable for an attorney of counsel's extensive experience, as the affidavits supporting it attest. The number of hours claimed, 240.85, is excessive, however, in view of plaintiffs' partial success. Accordingly, the court will award fees for 150 hours in the amount of $26,250, to be paid by the defendant within forty-five days of this order.

## IV. CONCLUSION

For the foregoing reasons, Counts One, Two and Three are dismissed by agreement. Defendant's Motion to Dismiss Count Four is hereby ALLOWED, and defendant's Motion to Dismiss Count Five is DENIED. The court will, however, dismiss Count Five as moot, given the ruling on plaintiffs' motion for fees. Plaintiffs' Motion for Attorneys' Fees is ALLOWED in the amount of $26,250, to be paid by the defendant within forty-five days.

A separate order will issue.

### ORDER

For the reasons stated in the accompanying Memorandum, defendant's Motion to Dismiss is hereby ALLOWED as to Count Four and DENIED as to Count Five. Count Five, however, is dismissed by the court *sua sponte* in view of the court's ruling on the motion for attorneys' fees. Plaintiffs' Motion for Attorneys' Fees is hereby ALLOWED. The defendant will pay to plaintiffs' counsel fees in the amount of $26,250 no later than forty-five days from this Order.

**Robert F. GOLDHAMMER and DD UK, Ltd., Plaintiffs,**

v.

**DUNKIN' DONUTS, INC., Defendant.**

No. Civ.A. 98–12568–PBS.

United States District Court, D. Massachusetts.

Aug. 6, 1999.

Cornelius J. Moynihan, Jr., Elizabeth M. Rice, Alida M. Coo, Peabody & Brown, Boston, MA, John M. Bradham, Louis E. Dolan, Jr., Peabody & Brown, Washington, DC, for Robert F. Goldhammer, DD UK Ltd., plaintiffs.

Robert L. Zisk, Thomas M. Finan of Schmeltzer, Aptaker and Shepard, P.C., Washington, DC, Robert A. Murphy, Joan M. Griffin, Casner & Edwards, Boston, MA, for Dunkin Donuts, Inc., defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *Introduction*

This action involves a dispute over an agreement to sell donuts in England between Dunkin' Donuts, Inc. ("Dunkin' Donuts"), and DD UK, Ltd. ("DD UK"). Dunkin' Donuts brought an action in English court against DD UK on December 22, 1997. When DD UK and Robert F. Goldhammer, a director and majority

shareholder active in management, filed their own action in federal court a year later, Dunkin' Donuts responded with a motion to dismiss or stay the diversity action on international abstention grounds because both actions share overlapping legal and factual issues. After hearing, this Court **DENIES** the defendant's motion to dismiss but stays the proceeding pending the outcome of the parallel first-filed English case.

## II. *Factual Background*

Plaintiff, DD UK, is a privately held corporation formed under the laws of England. The shares are owned, in large part, by two Massachusetts trusts. Robert Goldhammer, a Florida resident, is a director of DD UK and is the beneficiary of about two-thirds of the company's shares. He has outstanding loans of $615,000 to DD UK. Dunkin' Donuts is a Delaware corporation with its principal place of business in Randolph, Massachusetts.

In January 1987, DD UK and Dunkin' Donuts entered into a Multiple License Agreement ("MLA"), which authorized DD UK to develop the Dunkin' Donuts brand of donuts and pastries in London, England, and which set up terms for royalty payments and reporting of sales data. The MLA was negotiated and signed in Massachusetts but provides that it will be construed, interpreted, and governed by English law. According to Dunkin' Donuts, DD UK and Dunkin' Donuts later entered into an unwritten agreement, the branded cases agreement ("BCA"), authorizing DD UK to sell Dunkin' Donuts through free-standing product cases in various commercial outlets like convenience stores and gas stations, rather than the traditional stores. In September 1997, Dunkin' Donuts terminated DD UK's rights in the branded cases business. The disputed facts center around whether a branded cases agreement existed, whether Dunkin' Donuts enticed DD UK and Goldhammer to invest as a franchisee in the British market and then purposefully and deceitfully pushed them out, and whether DD UK fulfilled its commitments under the various agreements.

On December 22, 1997, Dunkin' Donuts filed suit in English court against DD UK seeking payment of royalties, interest, and other damages arising from the MLA and the BCA. On February 27, 1998, Dunkin' Donuts filed a second suit in English court seeking the same relief in addition to other unpaid royalties. The English court consolidated the two actions on July 24, 1998, and set up a discovery schedule. Three days later, Dunkin' Donuts amended its complaint with a number of allegations regarding the MLA and the BCA. Dunkin' Donuts argued that the MLA could be terminated on five years' notice and that the BCA existed as a separate agreement, which incorporated the payment and reporting terms of the MLA and which could be terminated on reasonable written notice. Alternatively, Dunkin' Donuts argued, the MLA had been "varied" to include the BCA.

DD UK filed its answer and counterclaims on August 21, 1998. DD UK denied liability for any royalties or damages, the ability to terminate the MLA on five years' notice, the existence of the BCA, and, alternatively, the reasonableness of six months notice for termination of the BCA. DD UK also denied that it had breached the MLA, the "varied" MLA, or the BCA, arguing that, in fact, Dunkin' Donuts was in repudiatory breach of the MLA. DD UK counterclaimed that Dunkin' Donuts had breached the implied covenant of good faith and fair dealing, and claimed damages, including lost profits through 2016. On October 5, 1998, discovery had been partially completed in the English case.

DD UK and Goldhammer filed the present action in this court, under diversity jurisdiction, on December 17, 1998. Goldhammer asserts claims against Dunkin' Donuts for fraud and deceit, negligent misrepresentation, and promissory estoppel. DD UK asserts claims against Dunkin' Donuts for breach of contract, breach of the implied covenant of good faith and fair

dealing, promissory estoppel, quantum meruit, unjust enrichment, fraud and deceit, negligent misrepresentation, and violation of Mass.Gen.L. § 93A. These claims arise from the same series of events as those underlying the English claims and counterclaims. Defendant, Dunkin' Donuts, moves to dismiss or stay this action on grounds of abstention based on international comity.

### III. *Discussion*

#### A. *Doctrinal Framework*

 Federal courts have the inherent power to stay an action based on the pendency of a related proceeding in a foreign jurisdiction. *See Boushel v. Toro Co.,* 985 F.2d 406, 409–10 (8th Cir.1993); *EFCO Corp. v. Aluma Sys., USA, Inc.,* 983 F.Supp. 816, 824 (S.D.Iowa 1997). *See generally Landis v. North Amer. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). However, this inherent power to stay parallel litigation must be balanced against the federal courts' "strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

Traditionally, federal courts have shown reluctance to decline jurisdiction in the face of this "virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 (1976) (discussing judicial economy considerations in the context of federal court abstention due to a pending litigation in a state court); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 14–16, 19, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (noting that a federal court will abstain from exercising jurisdiction because of a pending state court action only in "exceptional circumstances").

 Courts have been hesitant to abrogate this jurisdictional duty in the international context. "[P]arallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 926–27 (D.C.Cir.1984) (holding that "only in the most compelling circumstances does a court have discretion to issue an antisuit injunction"); *see also China Trade & Dev. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir.1987) (same); *Cliffs–Neddrill Turnkey International–Oranjestad v. M/T Rich Duke,* 734 F.Supp. 142, 150 (D.Del.1990).

This obligation to exercise jurisdiction, however, is not absolute. *See Quackenbush,* 517 U.S. at 716, 116 S.Ct. 1712; *Canada Malting Co. v. Paterson S.S., Ltd.,* 285 U.S. 413, 422, 52 S.Ct. 413, 76 L.Ed. 837 (1932) ("[T]he proposition that a court having jurisdiction must exercise it is not universally true."); *see also Colorado River,* 424 U.S. at 817, 96 S.Ct. 1236 (counseling that federal courts should consider issues of "wise judicial administration, ... conservation of judicial resources, and comprehensive disposition of litigation").

 As the Eleventh Circuit recently recognized, "in some private international disputes the prudent and just action is to abstain from the exercise of jurisdiction." *Turner Entertainment Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1518 (11th Cir.1994). "[I]n the interests of judicial economy and international relations, a federal court may stay an action in favor of pending foreign litigation." *Abdullah Sayid Rajab Al-Rifai & Sons v. McDonnell Douglas Foreign Sales Corp.,* 988 F.Supp. 1285, 1291 (E.D.Mo.1997) (citing *Boushel,* 985 F.2d at 410 n. 2). However, the mere fact that there are parallel proceedings in a foreign jurisdiction will not constitute an "exceptional circumstance" which justifies the abdication of federal jurisdiction. *See Neuchatel Swiss Gen. Ins. Co. v. Lufthansa Airlines,* 925 F.2d 1193, 1194–95 (9th Cir. 1991) (reversing stay in absence of exceptional circumstances); *Balcom v. Rosenthal & Co.,* No. 96–C6310, 1998 WL 2835,

at *7 (N.D.Ill. Jan.2, 1998) (denying stay despite parallel British action where parties were not substantially the same and other *Colorado River* factors were absent); *General Motors Corp. v. Ignacio Lopez de Arriortua,* 948 F.Supp. 656, 669 (E.D.Mich.1996) (declining to stay federal action despite a pending proceeding in Germany after weighing *Colorado River* factors).

■ The policies underpinning international abstention case law are rooted in concerns about international comity. "International comity is a doctrine that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law." *United States v. Nippon Paper Indus. Co., Ltd.,* 109 F.3d 1, 8 (1st Cir. 1997); *see also Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895) (" 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.").

Still open is the question whether the federal courts have the power to *dismiss* an action for damages because of parallel foreign litigation. In the abstention context involving parallel state proceedings, federal courts have power to dismiss or remand cases only where relief being sought is equitable or otherwise discretionary, but they may not do so in common law actions for damages. *See Quackenbush,* 517 U.S. at 719–22, 116 S.Ct. 1712. The "rationale of *Quackenbush* is that damages actions, unlike suits for equitable relief, do not invoke the court's equitable discretion." *DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir.1997). The Eleventh Circuit

concluded that *Quackenbush* did not extend to cases raising the abstention issue in light of concurrent international jurisdiction. *See Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1223 (11th Cir.1999). *But see Abdullah Sayid Rajab Al–Rifai & Sons,* 988 F.Supp. at 1290–91 (applying *Quackenbush* to abstention based on the pendency of a foreign action).

*Quackenbush* does not crisply govern in the area of international abstention because the considerations involved in deferring to state court proceedings are different from those involved in deferring to foreign proceedings. *See Posner,* 178 F.3d at 1223. Abstention implicates constitutionally rooted considerations of federalism and federal supremacy. *See Evergreen Marine Corp. v. Welgrow Int'l, Inc.,* 954 F.Supp. 101, 104 n. 1 (S.D.N.Y.1997); *Brinco Mining Ltd. v. Federal Ins. Co.,* 552 F.Supp. 1233, 1241 (D.D.C.1982). International comity is "more a matter of grace than a matter of obligation." *Nippon,* 109 F.3d at 8. The post-*Quackenbush* debate over the power of the federal court to dismiss an action for damages based on international abstention can be somewhat academic because, as a practical matter, in many circumstances a stay is tantamount to dismissal. *See Moses H. Cone,* 460 U.S. at 28, 103 S.Ct. 927 ("[A] stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay ... it presumably concludes that the parallel ... litigation will be an adequate vehicle for the complete resolution of the issues between the parties."). This is particularly true in light of the Uniform Foreign Money–Judgments Recognition Act. *See* Mass.Gen.L. ch. 235, § 23A. *See generally McCord v. Jet Spray Int'l Corp.,* 874 F.Supp. 436, 438 (D.Mass. 1994).

■ The federal trial courts have developed a roster of relevant factors in determining whether to grant a stay because of parallel litigation in a foreign forum: (1) similarity of parties and issues involved in the foreign litigation; (2) the promotion of

judicial efficiency; (3) adequacy of relief available in the alternative forum; (4) issues of fairness to and convenience of the parties, counsel, and witnesses; (5) the possibility of prejudice to any of the parties; and (6) the temporal sequence of the filing of the actions. *See Boushel,* 985 F.2d at 410 n. 2 (staying federal action in favor of Quebec action); *Abdullah Sayid Rajab Al–Rifai & Sons,* 988 F.Supp. at 1289 (staying federal action in favor of Kuwaiti litigation); *EFCO Corp.,* 983 F.Supp. at 824 (staying federal action in favor of Canadian litigation); *Evergreen,* 954 F.Supp. at 103 (staying federal action in favor of Belgian litigation); *Caspian Invs., Ltd. v. Vicom Holdings, Ltd.,* 770 F.Supp. 880, 884 (S.D.N.Y.1991) (dismissing federal action pending Irish litigation); *Continental Time Corp. v. Swiss Credit Bank,* 543 F.Supp. 408, 410 (S.D.N.Y.1982) (dismissing federal action in favor of Swiss action).

The overarching concerns for a federal court facing concurrent international jurisdiction are demonstrating a proper level of respect for the acts of other sovereign nations, ensuring fairness to litigants, and efficiently using scarce judicial resources. *See Turner,* 25 F.3d at 1518. As will be discussed below, these factors, on the whole, militate in favor of staying the present action pending the outcome of the English action.

## B. *The Balancing*

### 1. *Similarity of Parties and Issues*

■ This factor leans in favor of staying the action. The parties are the same in the two actions with two exceptions. The first distinction is that the parties trade places on either side of the "v." DD UK is a defendant in the English suit and a plaintiff here.

This seems to be a distinction without much difference in this case. The titles "plaintiff" and "defendant" have little significance where there are compulsory counterclaims in each suit. The analysis can just as easily rest on whether the counterclaims of the defendant in the first suit are similar to the affirmative claims of the plaintiff in the second. To do otherwise would be to ignore the admonition of the Seventh Circuit in *Martin v. Graybar,* 266 F.2d 202, 204 (7th Cir.1959), which discussed the appropriateness of antisuit injunctions involving two federal district courts:

> Two simultaneous pending lawsuits involving identical issues and between the same parties, the parties being transposed and each prosecuting the other independently, is certainly anything but conducive to the orderly administration of justice.

*Id. (cited in Small v. Wageman,* 291 F.2d 734, 736 (1st Cir.1961)); *see also Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1202 (2d Cir.1970) (Friendly, J.); *National Equip. Rental, Ltd. v. Fowler,* 287 F.2d 43, 46 (2d Cir.1961).

The second distinction is that Goldhammer is named separately as a plaintiff in the United States action. However, Goldhammer holds a two-thirds interest in DD UK and, thus, has substantially similar interests to those of DD UK. While a shareholder may have claims independent of the corporation, the parties and claims need not be identical in order for one action to be stayed or dismissed in deference to an earlier action. *See Landis,* 299 U.S. at 254, 57 S.Ct. 163 (noting that a court may stay proceedings in deference to another jurisdiction even if parties and issues are not identical); *Caspian,* 770 F.Supp. at 884.

The factual and legal issues in the two cases overlap, although the stated causes of action are different. Most of the issues require a determination of whether certain agreements existed, whether the terms of agreements were satisfied, and whether parties acted in bad faith in the performance of their contractual duties or in terminating the agreements. The fact that a claim sounds in tort rather than in contract does not mean that the factual

issues are so dissimilar that a stay may not be granted. *See id.*

### 2. *Promotion of Judicial Efficiency*

Judicial efficiency militates in favor of staying the action. Allowing this case to go forward in tandem with the English case "would consume a great amount of judicial, administrative, and party resources." *EFCO Corp.*, 983 F.Supp. at 824. Also, "simultaneous adjudications regarding identical facts and highly similar legal issues creates the risk of inconsistent judgments." *Id.* While avoidance of duplicative litigation is not dispositive when determining whether to stay a parallel proceeding, *see Elmendorf Grafica, Inc. v. D.S. America (East), Inc.*, 48 F.3d 46, 50 (1st Cir.1995); *Heibert Rojas–Hernandez v. Puerto Rico Elec. Power Auth.*, 925 F.2d 492, 496 (1st Cir.1991), it is a key factor to be considered, *see, e.g., Brinco*, 552 F.Supp. at 1241 (citing *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236).

### 3. *Adequacy of Relief Available in the Alternative Forum*

Plaintiffs claim that the English court cannot provide adequate relief for a number of reasons. Goldhammer claims that he could not have brought some of his claims in the English action. DD UK argues that there are claims in its complaint in the United States action, including a Massachusetts state statutory claim alleging unfair and deceptive business practices under Mass.Gen.L. ch. 93A, that are not included in its counterclaim in the English action. The fact that the Court is staying, rather than dismissing, the federal action provides future opportunity for any

relief (like multiple damages) not available to DD UK in the English action or precluded by it. *See EFCO Corp.*, 983 F.Supp. at 824–25 (citing *Boushel*, 985 F.2d at 409–10). Also, Mr. Goldhammer's individual claims (i.e., fraud) can be litigated here. Therefore, this factor weighs only slightly in favor of plaintiffs.

### 4. *Convenience of the Parties, Counsel, and Witnesses*

This factor does not favor either party. On the one hand, DD UK is an English company, the parties transacted business in England, they agreed that English law applied to the agreement, and many of the disputed facts are based on conduct occurring in England. With respect to Goldhammer, he decided to go to England to sell his donuts and actively managed the business there. It is not unfair to require an American party to defend and prosecute a case in England where the party has been engaged in "purposeful activity" there. *Hunt v. BP Exploration Co.*, 492 F.Supp. 885, 896 (N.D.Tex.1980). On the other hand, Dunkin' Donuts' principal place of business is Randolph, Massachusetts, and Peter Harwood, the key employee who managed its business in Great Britain, is a Massachusetts resident, as are other potential witnesses. This factor is a draw for both sides.

### 5. *Possibility of Prejudice to Any of the Parties*

Plaintiffs point out that there are serious differences in discovery rules between the two countries. Most notably, plaintiffs claim that the English court does not permit the taking of depositions.[1] Because

---

1. The parties dispute whether depositions are allowed under English procedure. Plaintiffs claim that numerous documents that were located in the United States have been lost, misplaced, destroyed, or taken by Dunkin' Donuts former employees and that depositions are needed to track them down. Plaintiffs assert that depositions are less available in English courts.

England has new civil procedure rules, which appear to apply to any "new step ... to be taken in any existing proceedings on or after 26 April 1999," and which provide procedures for taking depositions prior to trial both within and outside the jurisdiction. Civil Procedures Rules (English) Part I, ¶ 12 (1998). However, as plaintiffs contend, these new English rules are just that—new—and have yet to be used in practice. As the federal

---

courts grapple with methods of controlling discovery costs and English courts look to expand discovery rights, soon the key difference between the two systems might be the wigs.

In any event, because this Court retains jurisdiction under the stay, it can permit limited supplemental discovery if the new English rules turn out to hinder substantially the ability of the parties to locate documents in the United States through depositions.