**STATE OF NEW HAMPSHIRE (Department of Corrections and Department of Education), Petitioner, Appellee,**

v.

**Marc ADAMS, Respondent, Appellant.**

**No. 98–1244.**

United States Court of Appeals, First Circuit.

Heard Sept. 16, 1998.

Decided Nov. 12, 1998.

Jon Meyer, with whom Backus, Meyer, Solomon, Rood & Branch, Peter S. Smith, and Disabilities Rights Center were on brief, for appellant.

Nancy J. Smith, Assistant Attorney General, with whom Philip T. McLaughlin, Attorney General, was on brief, for appellee.

Before SELYA, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.

SELYA, Circuit Judge.

After the district court denied Marc Adams' application for attorneys' fees on the ground that he had not prevailed in proceedings under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–

1485, Adams launched this appeal. We affirm.

## I. BACKGROUND

■ In 1991, a New Hampshire state court sentenced Adams to 15–to–30 years in the state penitentiary for manslaughter. After Adams began serving his sentence (at age 20), he pointed to a learning disability, alleged a denial of his entitlement to a free and appropriate public education (FAPE) under the IDEA, and requested a due process hearing. Prior to the hearing, the parties reached an accord, embodied in a consent decree (the Decree) entered by the hearing officer. The Decree confirmed Adams' entitlement to a FAPE and obligated the school district in which the prison was located to develop an individualized education program (IEP) for each year of a two-year span (apparently compensating for a period during which Adams had not received a FAPE).[1] The IEP took effect early in 1993. The burden of implementation fell on the State.[2]

When the parties framed the IEP, Adams was classified by correctional authorities as a moderately high-risk (C–4) inmate and housed accordingly. This classification permitted full implementation of his IEP. Adams thereafter committed a series of disciplinary infractions, resulting in a change of classification to C–5 (maximum security risk) and placement in the prison's secure housing unit (SHU). Inmates housed in the SHU are subject to severe constraints on movement (e.g., they are permitted neither to interact with convicts in other classifications nor to leave the SHU except for medical emergencies and other exigencies). On the infrequent occasions when they do depart the SHU, C–5 inmates are handcuffed, shackled, and accompanied by guards. Thus, although the IEP entitled Adams to 5¼ hours of daily instruction and counseling—an entitlement that the State initially fulfilled—his placement in the SHU led ineluctably to a disruption of this schedule.

---

1. Although the obligation to furnish a FAPE ordinarily ends at age 21, see 20 U.S.C. § 1412(2)(B), individuals over that age sometimes may receive educational benefits to compensate for prior deprivations. See, e.g., Carlisle Area Sch. v. Scott P., 62 F.3d 520, 536 (3d Cir.1995).

2. Both the New Hampshire Department of Corrections and the New Hampshire Department of Education are obligated by the Decree. For ease in reference, we refer to them, jointly and severally, as "the State."

Faced with a conflict between the realization of legitimate security considerations and literal compliance with the IEP's terms, the State asserted the primacy of the former. Adams disagreed and again sought a due process hearing. The essence of his complaint was that the security constraints which impeded delivery of the requisite educational services to inmates in the SHU did not amount to a valid justification for shirking responsibilities imposed under the IDEA. An administrative hearing was held, *see* 20 U.S.C. § 1415(b)(2), and, at its conclusion, Adams filed a "Request for Relief." In it, he sought to compel the State to deliver the promised educational programs according to the tenor of the IEP, regardless of his security classification, and to provide an additional period of education to compensate for intervals during which the State had refused to do so.[3]

The hearing officer accepted Adams' thesis: he concluded that the IDEA trumped the prison's security regime and held that, by putting security uppermost, the State had failed to satisfy its obligations under the IEP. Consequently, he ordered the State either to allow the IEP to be implemented within the SHU as written, or, in the alternative, to permit Adams to leave the SHU to attend classes, notwithstanding his security classification. The hearing officer also granted Adams an additional period of compensatory education equal to the period from December 16, 1992, until the State began fully implementing Adams' IEP.

The State petitioned the district court for judicial review of this decision. *See* 20 U.S.C. § 1415(e)(2). While the appeal was pending, Adams' initial IEP expired. Thereafter, on March 21, 1996, the district court, concluding that the IDEA did not override the State's penological interests, vacated the

hearing officer's orders. Rather than remanding the case, the court retained jurisdiction and directed the parties to develop a new IEP, taking into account (1) Adams' entitlement to a FAPE while incarcerated; (2) the State's legitimate security and other penological concerns; (3) the potentiality of Adams' reclassification and the need for any revised IEP to avoid "thwart[ing] the prison's legitimate need to preserve order and discipline among inmates"; and (4) the importance of flexibility and the need to reach accommodations.[4]

Some nine months later, the parties negotiated an agreement (the Agreement) that established a new IEP under which Adams, then 25 years of age, was to receive two additional years of compensatory education. The new IEP was patterned on the old IEP but, because Adams had graduated from high school during the implementation of the old IEP, the substance of the new IEP was altered slightly to incorporate several college-level courses.

■ After the parties advised the district court of the Agreement, Adams revivified his earlier claim for counsel fees, asseverating that he had prevailed because the adversary proceedings produced the neoteric IEP (which, in his view, afforded him substantial benefits that he otherwise would not have obtained). The State demurred, arguing that the court's vacation of the hearing officer's orders demonstrated that it, not Adams, was victorious in the adversary proceedings, and that the context in which the second IEP was developed demonstrated both the relative insignificance of the relief obtained and the attenuation of the asserted causal link between the adversary proceedings and that relief. The district court agreed with the State on both scores and denied Adams' application.[5] This appeal followed.

---

3. At no time did Adams indicate that he would be content merely with making up the lost time after his tenure in the SHU expired, nor did the State indicate any disinclination to provide such compensatory education.

4. The district court did not explain why it elected to retain jurisdiction rather than remand. In the absence of an explanation, we assume that the court was hoping to prompt a consensual disposition, thereby saving time and money.

5. The IDEA expressly affords the court discretion to deny fees to a prevailing party. *See* 20 U.S.C. § 1415(e)(4)(B). Here, however, the court did not reach the point at which that discretion might be exercised, but instead ruled that Adams was not a prevailing party. Hence, we must address the question of prevailment, cognizant that, even were the appellant to succeed on this issue, he would not necessarily be entitled to a fee award.

## II. ANALYSIS

The central issue in this case relates to whether Adams prevailed within the purview of 20 U.S.C. § 1415(e)(4)(B), which permits a district court, in its discretion, to "award reasonable attorneys' fees as part of the costs to the parents ... of a child or youth with a disability who is the prevailing party." The appropriate analytic framework requires a fee-seeker to show both materiality and causation as prerequisites to achieving prevailing party status. *See Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). In conducting this tamisage, and in construing section 1415(e)(4)(B) generally, cases decided under kindred federal fee-shifting statutes, such as the Fees Act, 42 U.S.C. § 1988, furnish persuasive authority. *See Kathleen H. v. Massachusetts Dep't of Educ.*, 154 F.3d 8, 14 (1st Cir.1998).

The materiality component requires that, to qualify as a prevailing party, one must succeed on some significant claim within the litigation, thereby achieving at least some of the relief envisioned. *See Texas State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 791, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). In the Court's words, a plaintiff satisfies the materiality component when he achieves "relief on the merits of his claim" and that relief "materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar*, 506 U.S. at 111–12, 113 S.Ct. 566. The causation component of the prevailing party inquiry is similarly straightforward. It requires that "the party either must have enjoyed some bottom-line litigatory success or her suit must have had a catalytic effect in bringing about a desired result." *Guglietti v. Secretary of HHS*, 900 F.2d 397, 399 (1st Cir.1990). The basic standard of review is for abuse of discretion. *See Kathleen H.*, 154 F.3d at 14; *McDonald v. Secretary of HHS*, 884 F.2d 1468, 1474 (1st Cir.1989).

In this instance the district court resolved both aspects of the prevailment inquiry adversely to the appellant. As to materiality, the court noted that the struggle for primacy between the State's penological and security interests, on one hand, and Adams' interest in literal compliance with the IEP, on the other hand, formed the centerpiece of the dispute. Because the State won this struggle—indeed, that triumph formed the basis for the district court's vacation of the hearing officer's orders—it "prevailed" completely. Concomitantly, the court said that Adams "prevailed" on no claim that yielded significant relief; the additional compensatory education that he gained was de minimis in the broader context of the litigation and the Agreement neither "materially altered the nature of [the parties'] legal relationship, nor ... compel[led] the State to modify its behavior in a way th[at] directly benefitted Adams." We reiterate this holding, but we do not evaluate it. One who seeks "prevailing party" status under the IDEA must prove both materiality and causation, and, since causation is dispositive here, *see infra*, we elect to focus on the latter.

On the question of causation, the district court held flatly that Adams' resort to the adversary process earned him nothing that he could not easily have obtained for the asking. Assuming *arguendo* that additional secondary education represents significant relief (as the appellant asserts), the question of causation boils down to whether the pursuit of adversarial proceedings precipitated that relief. As the fee-seeker, Adams must carry the devoir of persuasion on this issue. *See Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). He may do so in one of two ways: through either a "merits" or a "catalyst" theory of causation. *See Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978). Because the appellant tries to travel both routes, we address these alternatives in sequence.

### A. The Merits Test.

A fee-seeker who aspires to prevailing party status may make the requisite showing of causation by satisfying the merits test. "[T]he merits test 'states the obvious, namely, that a party has prevailed if [he] wins the litigation.'" *Langton v. Johnston*, 928 F.2d 1206, 1224 (1st Cir.1991) (quoting *Coalition for Basic Human Needs v. King*, 691 F.2d 597, 599 (1st Cir.1982)). In this

iteration of his plea, the appellant argues that, even though the district court vacated a set of administrative orders favorable to him, its ruling amounted to a victory because the ruling implicitly acknowledged that the State had denied him a FAPE while he languished in the SHU. To mount this argument, Adams positions the denial of a FAPE as the foundation for his overarching claim and posits that, since the district court impliedly recognized such a denial when it directed the parties to negotiate, the court's order was the functional equivalent of a vindication on the merits.

This argument reads too much into the district court's ruling. In approving the State's subordination of the IEP's requirements to the security concerns created by Adams' own actions, the district court logically implied that no FAPE violation had occurred. Indeed, the court specifically said during the subsequent hearing on Adams' motion for fees: "Marc Adams wasn't denied free appropriate education while in SHU." And the court's subsequent written order on attorneys' fees stated bluntly that it had resolved the central legal issue against Adams.

We have held before that a district court is the best explicator of its own orders, *see, e.g., Martha's Vineyard Scuba Headquarters, Inc.,* v. *Unidentified, Wrecked and Abandoned Steam Vessel,* 833 F.2d 1059, 1066–67 (1st Cir.1987); *Lefkowitz v. Fair,* 816 F.2d 17, 22 (1st Cir.1987), and this case offers no occasion to contravene that principle. The parties' negotiation of a revised IEP, subsequent to Adams' defeat in the district court, could not transform a loss into a win.

### B. *The Catalyst Test.*

■ The appellant's fallback position rests on the catalyst theory. To achieve prevailing party status under this theory, a fee-seeker must demonstrate that his action served a provocative function in the calculus of relief, *see Guglietti,* 900 F.2d at 401, or, stated another way, that it "act[ed] as a 'catalyst' in

prompting defendants to take action to meet plaintiff's claims," *Nadeau,* 581 F.2d at 279. If this condition is met, and the action taken is material, then the plaintiff will be deemed a prevailing party "despite the lack of judicial involvement in the result." *Id.*[6]

■ Almost by definition, causation questions are fact-contingent, *see, e.g., Peckham v. Continental Casualty Ins. Co.,* 895 F.2d 830, 837 (1st Cir.1990), and are best visualized from a trial court's more intimate perspective. The trial court often is "in the best position to sort out coincidence from effect." *Langton,* 928 F.2d at 1225. Even in a situation where some of the critical events took place in an administrative forum, the trial court is closer to the matter than is an appellate tribunal. Consequently, we afford deferential review to such determinations, setting them aside only for abuse of discretion. *See id.*

■ The appellant posits that the filing of his second due process request brought about a beneficial result (additional compensatory education) that he otherwise would not have obtained. In its fee-denial order, the district court rejected this thesis. The court appropriately referenced the context in which the parties forged the Agreement to demonstrate why the two additional years of compensatory education were not causally linked to the due process request. It then stated:

> Adams obtained nothing in the ... settlement agreement that he would not have obtained had he made a reasonable effort to resolve the situation amicably in 1993, rather than: (1) invoke the administrative remedies available under the IDEA; and (2) interpose what was undeniably an unreasonable condition of settlement (i.e. full implementation of an unmodified IEP while he was in SHU).

The appellant vigorously disputes this determination. To bolster his view, he adverts to occasions during the course of the underlying proceedings when the State argued

---

6. To be sure, prevailing party status under a catalyst approach also necessitates a showing "that the fee-target did not act gratuitously." *Guglietti,* 900 F.2d at 401; *accord Kathleen H.,*

154 F.3d at 15. Because Adams failed to prove the requisite causal nexus, *see* text *infra,* we need not address whether the State acted gratuitously.

against the provision of additional compensatory education. This line of reasoning fails to account for the distorting force of litigation. While the cited statements (e.g., a letter dated February 10, 1996, from the State's counsel to the appellant's counsel) clearly reflect some recalcitrance on the State's part vis-à-vis additional compensatory education, the proper vector point for a catalyst analysis must be the defendant's position on the claim for relief *prior* to the onset of litigation—not jousting points taken in the heat of battle. Positions adopted by parties during the course of adversarial proceedings cannot be taken at face value because they tend to be artificially inflated.

Viewing matters in this light, the district court found that the State's reticence was no more than an understandable litigatory posture, taken in response to what the court characterized as a patently unreasonable demand on Adams' part. In the court's estimation, it was Adams' unflagging insistence on full implementation of his IEP notwithstanding his placement in the SHU that impeded a satisfactory resolution of the matter and required the parties to go head to head. The record supports this assessment. It seems plain, as the district court noted, that the genesis of the dispute concerned whether Adams' IEP requirements had to yield to countervailing security concerns, and that this issue became the focal point of the adversary proceeding. The district court's resulting inference—that, but for this controversy, a settlement which included additional compensatory education probably could have been reached without resort to litigation—seems eminently reasonable. This circumstance defeats the appellant's claim. *See Kathleen H.*, 154 F.3d at 14 (explaining that the fee-seeker must show that the school district would not have included the alleged benefit in the new IEP but for the litigation); *Payne v. Board of Educ.*, 88 F.3d 392, 400 (6th Cir.1996) (similar).

■ In all events, there is a lacuna in the appellant's proof. A party who seeks fees under a catalyst theory must show that the relief ultimately obtained was sought (or at least easily inferable from what was sought) and refused (expressly or by fair implication)

prior to the commencement of a contested hearing. *See Johnson v. Bismarck Public Sch. Dist.*, 949 F.2d 1000, 1003 (8th Cir.1991) (finding causal relationship lacking between the filing of a complaint and additional compensatory education when the plaintiff had failed to pursue this relief prior to filing a due process complaint); *cf. Kathleen H.*, 154 F.3d at 15 (rejecting the plaintiffs' characterization of their overall goal and relying in part on the absence of any evidence that the school district would have failed to provide the services ultimately awarded but for the administrative hearing). Adams offered no such proof.

The only evidence adduced here anent the State's pre-litigation posture bears on the issue of whether the legal obligations created by the initial IEP sufficed to override the State's penological policies. This is consistent with the appellant's concession that the State's unwillingness to accede to his demand for full implementation of the IEP's provisions while he was housed in the SHU constituted the motivating factor prompting his petition for a due process hearing. In short, the possibility of affording Adams additional compensatory education to offset the forced deprivation of services occasioned by his placement in the SHU was not addressed prior to the institution of adversarial proceedings. Given the paucity of other proof, this omission dooms the plaintiff's claim.

In a last-ditch effort to fill this void, Adams suggests that his abortive attempts to reach a negotiated resolution prior to initiating a due process hearing demonstrate that litigation was his only viable avenue for relief. This suggestion obscures the question of what terms he attempted to negotiate. A party who asks for the moon and the stars, and then sues and loses, cannot expect to receive fees when he thereafter settles for the same lesser constellation that his target likely would have been willing, all along, to provide. So it is here: Adams never made a demand for additional compensatory education as a solution to the SHU problem prior to his due process hearing. To the contrary, he demanded only a deviation from prison regulations in order fully to accommodate the IEP already in place. In the dis-

trict court's words, "[s]imply because Adams *subsequently* negotiated a revised IEP with which he is now satisfied does not entitle him to recover the substantial sums which were expended in what was a meritless effort to force the State to subordinate its penological interests to his IEP as written, notwithstanding obvious conflicts with the prison's legitimate security and operational goals."

 To sum up, Adams bore the burden of demonstrating that he would not have received additional compensatory education but for the prosecution of his due process request. To do that, he needed to produce some convincing indication of the State's unreadiness to provide compensatory education. The district court found that Adams failed to make the requisite showing. The sticking point, according to the court, was the appellant's obdurate insistence on an acknowledgment that his IEP trumped the security concerns embedded in the State's correctional policy, so that, even if he remained in the SHU, he would be allowed to attend classes as called for by his IEP. But for this insistence, the court reasoned, the State, if asked to furnish compensatory education for time spent in the SHU, likely would have acquiesced. These findings are reasoned and comport with a plausible rendition of the evidence. Thus, the lower court did not abuse its discretion in determining that Adams failed to establish the necessary causal connection between litigation and relief.[7]

We need go no further. The prevailing party requirement is an incentive mechanism designed to encourage prompt resolution of meritorious claims and to discourage unnecessary litigation. This policy rationale, evidenced in the Court's treatment of marginal victories, *see, Farrar,* 506 U.S. at 115, 113 S.Ct. 566, and unrelated claims, *see, Hensley,* 461 U.S. at 435, 103 S.Ct. 1933, is served by declining to award fees when litigation yields only relief that in all probability was attain-

able without the time and expense of adversarial proceedings.

*Affirmed.*

---

7. Adams makes another argument that is easily dispatched. He would have us rest on the chronology of events and hold that, because the State did not agree to provide additional compensatory education until the district court directed the parties to discuss settlement, the litigation perforce led to the benefit. But simple chronology, without more, is not a reliable indicator of causative effect. *See Langton,* 928 F.2d at 1225. Were the law otherwise, a plaintiff who sued and then settled always would be deemed a prevailing party regardless of the absurdity of his initial demand or that demand's lack of relatedness to the eventual settlement.