# United States Court of Appeals
## For the First Circuit

No. 01-1714

MAINE SCHOOL ADMINISTRATIVE DISTRICT NO. 35,

Plaintiff, Appellee,

v.

MR. AND MRS. R., ON THEIR OWN BEHALF
AND ON BEHALF OF THEIR SON, S.R.,

Defendants, Appellants.

No. 02-1312

MR. AND MRS. R., ON THEIR OWN BEHALF
AND ON BEHALF OF THEIR SON, S.R.,

Plaintiffs, Appellants,

v.

MAINE SCHOOL ADMINISTRATIVE DISTRICT NO. 35,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Farris,* Senior Circuit Judge,

and Howard, Circuit Judge.

Richard L. O'Meara, with whom Amy M. Sneirson and Murray, Plumb & Murray were on brief, for appellants.

Eric R. Herlan, with whom Drummond Woodsum & MacMahon were on brief, for appellee.

————————————

February 24, 2003

————————————

—————————————

*Of the Ninth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1487 (1997), obligates school districts to furnish a free appropriate public education (FAPE) to children with disabilities.  See id. §§ 1401(8), 1411(b)(2)(C), 1412(a)(1), 1413(i)(1), 1415(b)(1).  That is the good news.  The bad news is that the IDEA is not self-executing, and parents, school officials, bureaucrats, and judges alike have struggled to master its intricacies.

These consolidated appeals illustrate the point.  Taken together, they present two loosely related questions.  The first concerns whether parents who successfully resist a school district's effort, in an independent legal action, to overturn a stay-put placement on the ground of the alleged dangerousness of a child with disabilities are considered prevailing parties within the purview of the IDEA's fee-shifting provision.  The second concerns the circumstances under which a learning-disabled child who, by reason of his age, is no longer covered by the IDEA may nonetheless be entitled to some relief to compensate him for the deprivation of a FAPE during an earlier period.  The district court answered these questions in ways that pretermitted the appellants' claims for attorneys' fees and compensatory education. Concluding, as we do, that the court erred, we reverse the judgments below and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

We sketch the relevant facts. The appellants, Mr. and Mrs. R., are the parents of S.R. S.R., who was born in December of 1980, suffers from Down's Syndrome. He has had special educational needs throughout his formative years. During the times material hereto, Maine School Administrative District No. 35 (the School District) has had the responsibility of ministering to these needs.

Generally speaking, the IDEA obliged the School District to furnish S.R. with a FAPE sufficient to confer some educational benefit. See Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990). Federal law directs school districts to carry out such a duty through the development and implementation of an annual individualized education program (IEP). See 20 U.S.C. §§ 1401(11), 1412(a)(4), 1414(d); see also 34 C.F.R. §§ 300.340-50. S.R. was eligible for such special education services through the 2000-2001 school year (when he turned twenty years of age). See 20 U.S.C. § 1412(a)(1)(B)(i)-(ii) (linking eligibility for special education services to state law); Me. Rev. Stat. tit. 20-A, § 5201(1) (granting every student the right to public education through the school year encompassing his or her twentieth birthday).

It would serve no useful purpose to discuss S.R.'s early scholastic experiences. Rather, we begin with the 1999-2000 school year (which encompassed S.R.'s nineteenth birthday). In

-4-

furtherance of its responsibilities under the IDEA, the School District prepared an IEP for that year. Under it, S.R. spent mornings at Marshwood High School and afternoons at a work-site training program (where he also received some special education services).

During the 1999-2000 school year, S.R. displayed a variety of behavioral problems, including verbal outbursts and assaultive conduct. Believing that these problems stemmed from S.R.'s "ineffective and frustrating" IEP, Mr. and Mrs. R. repeatedly requested modifications. Officials of the School District met with the family many times to address these remonstrances, discuss S.R.'s current IEP, and ponder his future curriculum.

In June of 2000, the School District proffered a new IEP for the 2000-2001 school year. Under this proposal, S.R. was to be relegated to a work-site training program for the entire school day. His vocational training would be augmented with monthly speech therapy, sign language lessons, behavioral consultations, and social skills instruction.

S.R.'s parents rejected this proposal. They took especial umbrage at the fact that the draft IEP completely removed S.R. from a mainstream academic setting. Concluding that this circumstance violated their son's right to receive educational services in the least restrictive environment possible, see 20

U.S.C. § 1412(a)(5), the parents sought a hearing before the Maine Department of Education, see id. § 1415(f). The parents simultaneously invoked the IDEA's stay-put provision, id. § 1415(j), so that S.R. would remain in his 1999-2000 educational placement pending a resolution of his 2000-2001 IEP.[1] The School District defended the draft IEP, and, accordingly, resisted the parents' administrative petition.

The School District then took a more unusual step: it initiated a civil action in the United States District Court for the District of Maine (the First Suit) seeking to bar S.R. from returning to Marshwood High because his presence there would pose (or so the School District alleged) a substantial risk of danger to himself or others. Coincident with the filing of its complaint, the School District moved for temporary and preliminary injunctive relief. After reviewing the motion papers and the family's objection, the district court refused to issue a temporary restraining order (TRO). The effect of that ruling was to leave

---

[1]The stay-put provision, with an exception not applicable here, states:

> [D]uring the pendency of any proceedings conducted pursuant to [IDEA § 1415], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child, . . . until all such proceedings have been completed.

20 U.S.C. § 1415(j).

the stay-put order (and, thus, S.R.'s placement at Marshwood High) intact. The School District chose not to pursue the matter further, but, rather, moved to dismiss its complaint. See Fed. R. Civ. P. 41(a). The parents did not object but asserted an entitlement to attorneys' fees and costs. See 20 U.S.C. § 1415(i)(3)(B). The district court granted the School District's motion for voluntary dismissal but denied the parents' request for remuneration on the ground that they were not a prevailing party. Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., Civ. No. 00-242 (D. Me. Apr. 9, 2001). The parents filed a timely appeal.

Meanwhile, the administrative hearing anent the adequacy of the proposed 2000-2001 IEP went forward on a parallel track. In a decision dated October 31, 2000, the hearing officer approved the concept of a totally non-scholastic placement but determined that the IEP was inadequate in other respects. Consequently, he ordered the School District to prepare an amended IEP. The parents exercised their right to judicial review of this decision, see 20 U.S.C. § 1415(i)(2)(A); they commenced an action in the federal district court (the Second Suit) in which they sought to overturn the hearing officer's approval of S.R.'s work-site placement. The School District filed a cross-complaint challenging other parts of the administrative decision.

In December of 2001, S.R. reached his twentieth birthday. The following June, he graduated from Marshwood High. Upon the

-7-

occurrence of that event, the School District took the position that the parents' appeal from the administrative decision had become moot. In their reply, the parents gainsaid this contention. They pointed out that S.R. had dropped out of his special education program at Marshwood High during the 2000-2001 school year and asserted that he was entitled to compensatory education to offset the inadequate IEP that the School District had proposed.[2] After some skirmishing (the details of which need not concern us), the district court ruled that the suit was not "procedural[ly] moot[]" because the parents had raised the claim for compensatory education in a timely fashion.[3] Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., 176 F. Supp. 2d 15, 24-25 (D. Me. 2001). The court

---

[2]We need not dwell on the withdrawal, as it is irrelevant to the appellants' compensatory education claim. Cf. Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 4 n.3 (1993) (holding that a school district's responsibility for providing appropriate educational services is not discharged merely because the parents voluntarily withdrew their child from a placement); Doe v. Brookline Sch. Comm., 722 F.2d 910, 916 (1st Cir. 1983) (suggesting that after withdrawal from a public school, a handicapped student still may pursue funding for an appropriate placement during that period). If it is eventually determined that S.R. would not have received a FAPE had he remained at Marshwood under the stay-put placement — a matter on which we take no view — his withdrawal would not foreclose his claim for compensatory education.

[3]The district judge — the same judge who earlier had dismissed the First Suit without an award of attorneys' fees — referred the School District's motion to dismiss to a magistrate judge. See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). He thereafter accepted and adopted the magistrate judge's detailed report and recommendation. For simplicity's sake, we do not distinguish between the two judicial officers. Rather, we take an institutional view and refer to the determinations below as those of the district court.

nevertheless dismissed the case for what it termed "substantive mootness," declaring that "S.R. [had] received, for all that appears in the record, the very relief he and his parents initially sought in this action, by virtue of the . . . 'stay-put' ruling." Id. at 25. The second appeal followed. We consolidated it with the earlier appeal (which had been stayed) for briefing and argument. We now resolve both appeals.

## II. ANALYSIS

The parents — we henceforth shall refer to them as the appellants — press ahead on two fronts. They assign error to the lower court's determination that they were not prevailing parties in the First Suit. They also protest the district court's dismissal of the Second Suit as moot, pointing to the pendency of their compensatory education claim. We address these points sequentially.

### A. The Attorneys' Fee Claim.

In most civil litigation, the parties are responsible for paying their own attorneys' fees. See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 602 (2001); Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 293 (1st Cir. 2001). Despite this general rule, Congress sometimes chooses to allow for fee-shifting in particular situations, and it chose to do so in connection with the IDEA. The statute provides in relevant part:

> In any action or proceeding brought under [section 1415 of the IDEA], the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party.

20 U.S.C. § 1415(i)(3)(B). Because this provision employs the phrase "prevailing party" — a term of art — it must be interpreted and applied in the same manner as other federal fee-shifting statutes that use the same phraseology. See New Hampshire v. Adams, 159 F.3d 680, 684 (1st Cir. 1998) (explaining that, in construing the IDEA's fee-shifting provision, "cases decided under kindred federal fee-shifting statutes, such as the Fees Act, 42 U.S.C. § 1988, furnish persuasive authority"); H.R. Rep. No. 105-95, at 105-106 (1997), reprinted in 1997 U.S.C.C.A.N. 78, 103-104 (stating that section 1415(i)(3)(B) should be construed in keeping with Hensley v. Eckerhart, 461 U.S. 424, 440 (1983), a Fees Act case); see also Buckhannon, 532 U.S. at 603 (classifying "prevailing party" as a term of art).

For purposes of a federal fee-shifting statute, a prevailing party is any party who "succeed[s] on any significant issue . . . which achieves some of the benefits plaintiffs sought in bringing suit." Hensley, 461 U.S. at 433. The party's success cannot be a hollow victory; it must materially alter the litigants' legal relationship by modifying one party's behavior in a way that

directly benefits the other.[4]  See Farrar v. Hobby, 506 U.S. 103, 111-12 (1992); Gay Officers, 247 F.3d at 293.  Thus, the change effected must be material; a purely technical or de minimis victory cannot confer prevailing party status.  Tex. State Teachers' Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792 (1989); Stanton v. S. Berkshire Reg'l Sch. Dist., 197 F.3d 574, 576 (1st Cir. 1999).

It follows from the foregoing that a court faced with the need to decide whether a litigant is (or is not) a prevailing party must make a qualitative inquiry into the import of the result obtained.  Gay Officers, 247 F.3d at 293, 295; see also Christopher P. v. Marcus, 915 F.2d 794, 804 (2d Cir. 1990) ("[I]t is helpful to identify the relief sought by the plaintiff and compare it with the relief obtained as a result of the suit.").  Where, as here, prevailing party status turns on a question of law, we afford

---

[4]In a case involving the fee-shifting provisions of the Americans with Disabilities Act, 42 U.S.C. § 12205, and the Fair Housing Act Amendments, id. § 3613(c)(2), the Supreme Court concluded that the change in the legal relationship must be one to which a judicial imprimatur attaches.  Buckhannon, 532 U.S. at 605. We applied that rationale to a claim brought under the Fees Act, 42 U.S.C. § 1988.  See New Engl. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 30 (1st Cir. 2002).  Two of our sister circuits have adopted Buckhannon's reasoning in connection with the IDEA's fee-shifting provision.  See John T. v. Del. County Intermed. Unit, ___ F.3d ___, ___ (3d Cir. 2003) [2003 WL 194874, at *8-*10]; J.C. v. Reg'l Sch. Dist. 10, 278 F.3d 119, 123-24 (2d Cir. 2002).  But see TD v. La Grange Sch. Dist. No. 102, 222 F. Supp. 2d 1062, 1065 (N.D. Ill. 2002) (positing that "there exist critical distinctions in the text and structure of the IDEA and the ADA and FHAA that persuade me that the Court's ruling in Buckhannon was not meant to extend to the IDEA").  These appeals do not require us to resolve this conflict, and we therefore express no opinion as to whether the Buckhannon rule applies in IDEA cases.

plenary review.  Gay Officers, 247 F.3d at 292-93; Domegan v. Ponte, 972 F.2d 401, 406 (1st Cir. 1992).  With this paradigm in mind, we turn to the assignment of error.

The appellants ask for attorneys' fees referable only to the First Suit.  Their position is straightforward:  the School District commenced a civil action and the appellants successfully defended against it (i.e., the School District did not receive any of the relief that it sought and, eventually, threw in the towel).  The School District rejoins that this victory was merely interlocutory — a single battle in the war over the 2000-2001 IEP — and therefore is insufficient to support prevailing party status.  We test these hypotheses.

In general, the materiality requirement demands that a party succeed on the merits of a claim or defense.  Adams, 159 F.3d at 684.  But a party may be considered "prevailing" even without obtaining a favorable final judgment on all (or even the most crucial) of her claims.  Buckhannon, 532 U.S. at 603; Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 32 (1st Cir. 2001); see generally William H. Danne, Jr., Annotation, Who Is Prevailing Party for Purposes of Obtaining Attorney's Fees Under § 615(i)(3)(B) of Individuals with Disabilities Education Act, 153 A.L.R. Fed. 1 (1999) (collecting cases).  Thus, interlocutory orders that confer substantive injunctive relief often have been viewed as sufficient

to carry the weight of a fee award.[5]  E.g., Haley v. Pataki, 106 F.3d 478, 483 (2d Cir. 1997); Pearson v. Fair, 980 F.2d 37, 45 (1st Cir. 1992) (collecting cases).

On the other hand, interlocutory orders that serve merely to maintain the status quo usually are deemed insufficient to buoy a fee award.  See LSO, Ltd. v. Stroh, 205 F.3d 1146, 1161 (9th Cir. 2000).  Consequently, a successful invocation of the IDEA's stay-put provision, on an interlocutory basis, ordinarily will not confer prevailing party status.  See, e.g., J.O. v. Orange Township Bd. of Educ., 287 F.3d 267, 274 (3d Cir. 2002); Bd. of Educ. v. Steven L., 89 F.3d 464, 469 (7th Cir. 1996).

This case, however, is not cut from the usual cloth.  We are dealing here not with a stay-put order issued, on an interlocutory basis, in the course of ongoing judicial review.  Rather, the First Suit was an independent, free-standing civil action, instituted by the School District, in which it sought to enjoin the operation of the stay-put provision.  That quest for injunctive relief was the sole object — the raison d'être — of the First Suit.

To be sure, the School District probably saw the First Suit as a piece of a larger dispute between it and the appellants over the 2000-2001 IEP.  But a party's subjective view of a cause

_____

[5]We say "often" because the rule is not invariable.  See, e.g., Foreman v. Dallas County, 193 F.3d 314, 323 (5th Cir. 1999) (stating that TROs can never constitute merits-based relief).

-13-

of action counts for very little in determining prevailing party status.  See Tex. State Teachers' Ass'n, 489 U.S. at 791; Nadeau v. Helgemoe, 581 F.2d 275, 280 (1st Cir. 1978).  By the same token, it is immaterial whether the School District ultimately withdrew its complaint because it thought that the administrative decision had rendered the request moot.  See Watson v. County of Riverside, 300 F.3d 1092, 1095-96 (9th Cir. 2002); Bisciglia v. Kenosha Unified Sch. Dist. No. 1, 45 F.3d 223, 230 (7th Cir. 1995).  We search, therefore, for more objective indicia.

We deem it important to emphasize that the School District, not the appellants, brought the First Suit.  The appellants were haled into court as defendants and won a clear-cut victory on the sole issue in the case (an issue that had been framed by the School District).  A triumphant defendant may qualify as a prevailing party for the purpose of obtaining a fee award.  See, e.g., Weyant v. Okst, 198 F.3d 311, 316 (2d Cir. 1999) (collecting cases); see also Burke v. Guiney, 700 F.2d 767, 771 (1st Cir. 1983).  It follows inexorably that a defendant who prevails on the only claim that justifies the presence of the case in a federal court has a legitimate basis for asserting that she is the prevailing party.  See Perlman v. Zell, 185 F.3d 850, 859 (7th Cir. 1999).

This conclusion is reinforced by our awareness that the School District could have appealed the stay-put order as part and

parcel of judicial review of the IEP, see 20 U.S.C. § 1415(i)(2)(A), but eschewed that course. It elected instead to pursue an independent cause of action by invoking a statute that permits temporary changes in a child's placement if a school district can demonstrate "by substantial evidence that maintaining the current placement of such child is substantially likely to result in injury to the child or to others." Id. § 1415(k)(2)(A). This statute does not carve out an exception to section 1415(j)'s stay-put provision. See Honig v. Doe, 484 U.S. 305, 324-25 (1988); Timothy W. v. Rochester, N.H., Sch. Dist., 875 F.2d 954, 972 (1st Cir. 1989); cf. Orange Township, 287 F.3d at 272-73 (implying that sections 1415(j) and 1415(k)(2) are independent in terms of prevailing party determinations). Indeed, a restraining order under section 1415(k)(2) requires the proponent to proffer substantial evidence that the affected child's current placement poses a significant and unreasonable likelihood of injury either to himself or to others. 20 U.S.C. § 1415(k)(2)(A), (C). The merits of the IEP dispute are almost wholly irrelevant. Cf. Honig, 484 U.S. at 324-25 (emphasizing the dichotomy between injunctions for safety and stay-put placements).

In fine, the School District chose to make S.R.'s alleged dangerousness a contested issue in and of itself and to try to change his placement accordingly. That is to say, the injunctive action that it brought under section 1415(k)(2) (the First Suit)

-15-

attempted to work an autarkic material alteration in the legal relations between the parties. Defeating that attempt, once and for all, gave the appellants solid ground on which to base prevailing party status.[6]

This result squares with commonly accepted notions of materiality in the fee-shifting context. The materiality of a judicial outcome depends in part on whether the result is purely procedural or whether it actually accomplishes something substantive for the winning party. See Adams, 159 F.3d at 685-86; Krichinsky v. Knox County Sch., 963 F.2d 847, 849-50 (6th Cir. 1992); see also Hanrahan v. Hampton, 446 U.S. 754, 759 (1980). Because the district court denied injunctive relief on the basis that the School District had not adduced sufficient proof to satisfy the section 1415(k)(2) standard, it is readily evident that the appellants successfully defended the First Suit on the merits.

This thesis is confirmed by considering what would have happened had the appellants not appeared in court to oppose the School District's action. In that event, the court most likely

_____

[6]This result is not altered because the critical decision took place on a motion for a TRO. The court below must have been cognizant of the delays characteristic of administrative and judicial proceedings under the IDEA. See Burlington Sch. Comm. v. Mass. Dep't of Educ., 471 U.S. 359, 370 (1985) (describing such proceedings as "ponderous"). Thus, the denial of the School District's motion was effectively a final judgment on the merits of the "dangerousness" claim that the School District had brought. See Coalition for Basic Human Needs v. King, 691 F.2d 597, 600-01 (1st Cir. 1982).

-16-

would have entered a default judgment and changed S.R.'s placement. By defending, the appellants not only deprived the School District of the benefit that it sought in bringing suit but also blocked it from implementing a course of action inimical to S.R.'s interests. The appellants' victory was, therefore, material. See Farrar, 506 U.S. at 111-12; Stanton, 197 F.3d at 576.

For these reasons, we conclude that the appellants were the prevailing parties in the First Suit, and that the district court erred as a matter of law in holding to the contrary. Accordingly, we reverse the district court's order and remand the First Suit so that the court may determine whether special circumstances exist that might bar an award, and, if not, the amount of attorneys' fees and costs to which the appellants are entitled.

### B.  **The Compensatory Education Claim**.

We turn now to the justiciability of the appellants' compensatory education claim.  It is black-letter law that, in a federal court, justiciability requires the existence of an actual case or controversy.  U.S. Const. art. III, § 2, cl. 1.  Even if an actual case or controversy exists at the inception of litigation, a case may be rendered moot (and, therefore, subject to dismissal) if changed circumstances eliminate any possibility of effectual relief.  CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620-21 (1st Cir. 1995).

In a suit seeking only injunctive relief, this ordinarily means that once the act sought to be enjoined occurs, the suit must be dismissed as moot. E.g., Oakville Dev. Corp. v. FDIC, 986 F.2d 611, 613 (1st Cir. 1993). If, however, a plaintiff seeks alternative redress (such as money damages) in addition to injunctive relief, the occurrence of the watershed event may not render the controversy moot. CMM Cable Rep., 48 F.3d at 621; Curtis Indus., Inc. v. Livingstone, 30 F.3d 96, 97-98 (8th Cir. 1994). We review de novo a lower court's dismissal of an action on the ground of mootness. See Verhoeven v. Brunswick Sch. Comm., 207 F.3d 1, 5 (1st Cir. 1999); N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 12 (1st Cir. 1996).

In this instance, the question of mootness depends on the viability of the appellants' compensatory education claim. We know that a child eligible for special education services under the IDEA may be entitled to further services, in compensation for past deprivations, even after his or her eligibility has expired. See, e.g., Adams, 159 F.3d at 682 n.1; Pihl v. Mass. Dep't of Educ., 9 F.3d 184, 188-89 & n.8 (1st Cir. 1993). Such a child's claim for compensatory education begins to accrue when his or her IEP is so inappropriate that the child is receiving no real educational benefit. M.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 396 (3d Cir. 1996); Murphy v. Timberlane Reg'l Sch. Dist., 22 F.3d 1186, 1195 (1st Cir. 1994). The presence of an actionable claim for

compensatory education will insulate an IDEA case against a mootness challenge even after the child's eligibility for special education services ends. Indep. Sch. Dist. No. 284 v. A.C., 258 F.3d 769, 774-75 (8th Cir. 2001); cf. Thomas R.W. v. Mass. Dep't of Educ., 130 F.3d 477, 480 (1st Cir. 1997) (stating the negative of the same proposition).

Orderly procedure suggests that we bifurcate our discussion of this issue. We first must determine whether the appellants timely asserted their claim for compensatory education. If so, we then must address the question of whether S.R. arguably suffered a deprivation of services that would give rise to such a claim.

1. **Timeliness**. The district court concluded that the appellants had advanced the compensatory education claim in a timely manner. See Me. Sch. Admin. Dist., 178 F. Supp. 2d at 24-25. We affirm that holding on the basis of the district court's lucid analysis of the record and its perspicacious reasoning. See id. We add only that, once the end of S.R.'s eligibility for special education services loomed, the appellants acted expeditiously to make known their desire that the School District offset the inadequacies of the 2000-2001 school year by providing compensatory education. No more was exigible. See Thomas R.W., 130 F.3d at 480.

In a related vein, we reject the School District's importuning that the compensatory education claim was barred by a failure to exhaust administrative remedies. The appellants' objections to the IEP related only to S.R.'s final year in school. S.R. was within the eligible age limits when that year began; by the time that year ended, the administrative record had been closed for quite some time and the case was pending before the district court. Although parents ordinarily must exhaust their administrative remedies before appealing to a federal court, see Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 59, 63 (1st Cir. 2002), the appellants' failure to raise a then-nonexistent compensatory education claim before the hearing officer is not fatal to judicial review. See id. at 59; Pihl, 9 F.3d at 190-91. Parents are not expected to have the gift of prophecy.

2. **Mootness**. We turn next to the district court's holding that the compensatory education claim was substantively moot. Me. Sch. Admin. Dist., 178 F. Supp. 2d at 25. In coming to this conclusion, the court focused on the appellants' challenge to the work-site placement. We think that this focus was too narrow.

S.R.'s placement at a work site rather than in a school was only a part of the overall IEP. The record shows beyond hope of contradiction that the appellants sought from the beginning an appropriate IEP for the 2000-2001 school year — a new IEP that did not merely replicate S.R.'s unsuccessful 1999-2000 IEP. The

hearing officer responded to these expressed concerns, dissecting the School District's suggested IEP, approving parts of it (including the work-site placement) and disapproving other parts. Although the appellants only sought judicial review of the placement decision, not of the order to add other features to the IEP, the fact remains that S.R. never enjoyed the benefits that would have flowed from the implementation of those other features. In short, while S.R. was not relegated to a work site for the 2000-2001 school year, he may not have received an appropriate IEP for that year (and, thus, may not have received the FAPE to which he was entitled).

The School District attempts to cast doubt upon the factual antecedents of the appellants' position. The attempt fails. The record fully supports the appellants' asseveration that, all along, they sought the development of an appropriate IEP, different from both the previous IEP (1999-2000) and the proposed IEP (2000-2001). Indeed, their criticisms of the 1999-2000 IEP were vociferous. So viewed, the appellants have a colorable claim that the continuation of this benighted placement into the 2000-2001 school year deprived S.R. of the compendium of services reasonably necessary to constitute a FAPE. See Roland M., 910 F.2d at 992.

Let us be perfectly clear. We recognize that compensatory education is not an appropriate remedy for a purely

procedural violation of the IDEA.  Erickson v. Albuquerque Pub. Sch., 199 F.3d 1116, 1122-23 (10th Cir. 1999).  In contrast, a substantive violation may give rise to a claim for compensatory relief.  See Rome Sch. Comm., 247 F.3d at 31; Pihl, 9 F.3d at 188, 189-90 (collecting cases).  Here, the prospective relief that the appellants sought at the commencement of these proceedings was both procedural and substantive.  Thus, a claim for compensatory education arguably lies — and their case is not moot.

In an effort to blunt the force of this reasoning, the School District complains that the appellants forced it, through the invocation of the stay-put provision, to maintain S.R.'s contested 1999-2000 IEP throughout the 2000-2001 school year (or nearly so).  That is true as far as it goes — but it does not advance the School District's cause.  The appellants never sought a stay-put placement as relief on the merits before either the hearing officer or the district court.  For them, the stay-put placement was merely the lesser of two evils.[7]  See Burr v. Ambach, 863 F.2d 1071, 1076 (2d Cir. 1988) (describing the stay-put provision as protection against an even worse placement during the pendency of review proceedings).  Conferring blanket immunity from

[7]The School District did not seek to secure the parents' agreement to an alternative interim placement.  See 20 U.S.C. § 1415(j) (quoted supra note 1) (permitting such consensual arrangements).  Such an agreement would have averted any liability for compensatory education.  See W.B. v. Matula, 67 F.3d 484, 500 (3d Cir. 1995); see also Doe v. Defendant I, 898 F.2d 1186, 1189 (6th Cir. 1990).

-22-

compensatory education claims during the course of a stay-put placement would reward school districts for misfeasance or nonfeasance in providing appropriate educational services. Cf. Jefferson County Bd. of Educ. v. Breen, 853 F.2d 853, 857-58 (11th Cir. 1988) (awarding compensatory education to deter school districts from unnecessarily prolonging litigation); Doe v. Brookline Sch. Comm., 722 F.2d 910, 916 (1st Cir. 1983) (condemning a rule that would allow a party who shirks its duties during a stay-put placement to escape liability for its laxity). The case law, though sparse, suggests that courts should refuse to confer any such blanket immunity. See, e.g., W.B. v. Matula, 67 F.3d 484, 500 (3d Cir. 1995); M.C. v. Voluntown Bd. of Educ., 56 F. Supp. 2d 243, 250 n.7 (D. Conn. 1999). We so hold: claiming to be caught between a rock and a hard place is no excuse for dereliction of duty. The IDEA charges school districts with making reasonable efforts both to work with parents and to satisfy the needs of special education students. That entails the responsibility to find a path that runs between the rock and the hard place. Knee-jerk compliance with a stay-put provision does not negate that responsibility.

The School District also submits that the appellants failed to allege specific facts in support of their claim for compensatory education. They suggest that the appellants needed to

show precisely what services S.R. should have received (but did not) during the 2000-2001 school year. This sets the bar too high.

The IDEA constructs a framework that ensures procedural due process in the IEP context. See 20 U.S.C. § 1415. It does not attempt to delineate the specific substance of any particular child's IEP. That is as it should be: IEPs are by their very nature idiosyncratic, and the appropriate content of a particular child's IEP for a given year can only be determined by those assigned to evaluate the child and develop the IEP (with the help of the parents). See id. §§ 1401(11), 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.340-50. In mounting a challenge to a current or proposed IEP, the most that parents can be expected to do is to point out areas in which the IEP is deficient. See Rowley, 458 U.S. at 208-09; Erickson, 199 F.3d at 1123; Roland M., 910 F.2d at 992.

These tenets hold true vis-à-vis claims for compensatory education. See Cent. Reg'l Sch. Dist., 81 F.3d at 397 (noting that "a child's entitlement to special education should not depend upon the vigilance of the parents"). The appellants, who pointed to many problems in both the 1999-2000 IEP and the proposed 2000-2001 IEP, did their part. Consequently, we reject the School District's suggestion that the appellants' compensatory education claim was insufficiently precise.

None of this is equivalent to saying that S.R. is entitled to compensatory education. We hold only that the appellants' claim for compensatory education deserves to be considered on the merits and that the district court should not have jettisoned it as moot. Accordingly, the order of dismissal must be reversed and the compensatory education issue remanded to the district court. If the district court does not believe that the record is sufficient to permit it to make the highly nuanced judgments necessary to resolve the claim for compensatory education, it may remand the matter for further administrative adjudication.

## III. CONCLUSION

We need go no further.[8] We hold that the appellants were prevailing parties in the First Suit; that the claim for compensatory education was properly raised, and remained viable, in the Second Suit; and that, therefore, the district court erred in its adjudication of appellants' claims. Hence, we reverse the judgments below and remand for further proceedings consistent with this opinion.

---

[8]The appellants' complaint in the Second Suit also contained claims under the Rehabilitation Act, 29 U.S.C. § 794, and Maine's special education laws, Me. Rev. Stat. tit. 20-A, §§ 7001-8207. The district court never addressed these claims, and the parties do not discuss them on appeal. We therefore take no view as to their justiciability.

**Reversed and remanded**.  **Costs are taxed in favor of the appellants**.